**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **United States of America,** | **Criminal No. 07-388 (PAM/JJG)** |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| **Le Guo Wu (01),** | |
| Defendant. | |

JEANNE J. GRAHAM, United States Magistrate Judge

The above-entitled matter came on for a hearing before the undersigned Magistrate Judge of the District Court on December 13, 2007, on the pretrial motions of defendant Le Guo Wu. Hal Harlowe, Esq., appeared on behalf of Mr. Wu (Wu). David Genrich, Assistant United States Attorney, appeared on behalf of the Government. Each party submitted briefs. The nondispositive motions were previously decided IN AN ORDER DATED December 17, 2007 (Doc. #96). This R&R addresses each of defendant's dispositive motions. These motions are referred to this Court for a Report and Recommendation in accordance with 28 U.S.C. § 636 and Local Rule 72.1.

Wu advances seven motions to suppress., relating to separate search warrants executed for various locations, e-mail accounts and personable property. In sum, Wu challenges each search warrant for lack of probable cause. (Docs.# 53-55, 65, 68, 70 and 91).

**I. BACKGROUND**

This matter arises from an investigation of Wu's alleged involvement with at least one other person, co-defendant Houa Vang (Vang), in a conspiracy to commit marriage fraud and engage in alien smuggling, using sham marriages to allow Chinese nationals to gain entry into and fraudulently obtain immigration benefits from the United States. As part of the investigation, agents received information from at least two individuals, purportedly describing the scheme and how Wu and Vang accomplished the fraud. Several search warrants were submitted to various federal district courts. They were signed and executed in their respective districts. The disputed search warrants listed by their corresponding exhibit and motion numbers are as follows:

1. October 17, 2007 Warrant – Yahoo Account – District of Minnesota (Doc. #53)
2. March 30, 2007 Warrant – Hotmail Account – District of Minnesota (Doc. #54)
3. August 29, 2007 Warrant – Hotmail Account – District of Minnesota (Doc. #54)
4. October 17, 2007 Warrant - Hotmail Account - District of Minnesota (Doc. #54)
5. October 29, 2007 Warrant – Watts Street Residence – Eastern District of Pennsylvania (Doc #55)
6. November 5, 2007 Warrant – Person of Le Wu – District of Minnesota (Doc. #91)
7. October 25, 2007 – Lat/Long Data Order – District of Minnesota (Doc. #65)
8. October 17, 2007 Warrant – Gmail Account – District of Minnesota (Doc. #68)
9. October 29, 2007 Warrant – Broad Street Residence – Eastern District of Pennsylvania (Doc. #70)

Each of the warrants, with the exception of the search warrant for Wu's personal property, is based upon similar background information describing the alleged illegal

scheme. Then, each has additional details describing why there is probable cause to believe that evidence of such crimes will be found in the locations to be searched. Wu contends that his Fourth Amendment rights were violated, because there is insufficient evidence of the veracity and reliability of the persons who supplied information to the investigators. The Court disagrees and recommends that the motions to suppress evidence be denied, as each warrant contains sufficient probable cause to establish a fair probability that contraband or evidence of a crime would be found in the place to be searched.

## II.  THE COMMON FACTS

There are facts common to all the warrants, with the exception of the warrant for Wu's personal property. These common facts generally describe the nature of the criminal activity upon, which the search warrants seek evidence or contraband. In each, a confidential reliable informant (CRI) and cooperating witness (CW) detail how the marriage fraud scheme works. Specifically,[1] on May 12, 2006, a CRI recruited by Wu to participate in the illegal scheme gave information to investigating agents. Wu offered the CRI $13,000 to marry a Chinese national, who would then enter the United States and use the sham marriage to obtain immigration benefits or Permanent Residency status. To facilitate the scheme, the CRI was offered a free trip to China to document the sham marriage.

The affidavits state that the CRI's information was "verified through investigative means, including through consensually-monitored communication, checks of ICE indices, and review of immigration documents submitted to perpetrate the fraudulent

---

[1] The following facts will be stated as they are found in the search warrant affidavits. Obviously, these are alleged facts, but for purposes of this analysis, the court will recite the facts as relayed in the affidavit.

scheme". Agents also reviewed Wu's telephone records, "filings connected to names provided by the CRI, airline flight manifests and other resources…" and that review substantiated a pattern of fraud consistent with the information provided by the CRI...". Over 70 suspected fraudulent petitions were identified based upon their review .

Approximately 10 months later, the CW was stopped upon his/her return to the United States from a trip to China.  CW admitted that Wu recruited him/her into a fraudulent marriage scheme.  CW confessed that the purpose of the scheme was to allow Chinese nationals to enter the United States to fraudulently obtain immigration benefits.  CW met Wu in Philadelphia to coordinate the trip to China.  Wu helped the CW obtain a passport and other documents for the trip to China and the sham marriage.  Wu paid CW a portion of the money promised to CW by Wu.  The CW said that others participating in the marriage fraud also met with Wu in Philadelphia.

The affidavits indicate that not only was the CW's information consistent the information provided by the CRI, but that CW's information was "verified through ICE investigative techniques, including but not limited to, consensually-monitored communications, review of ICE indices, and review of relevant immigration and alien files."

Additionally, the CRI and CW continued to cooperate in the investigation by engaging in consensually monitored phone calls and meetings with Wu.  During those calls and meetings, Wu continued to express a desire to recruit U.S. citizens to participate in the fraudulent scheme.  Wu also continued to instruct the participants on travel to and from China.  Specifically, the affidavits explain that during one monitored call with CW in October of 2007, Wu "discussed recruitment for the marriage fraud ring…".  Finally,

through surveillance, Wu was spotted in Philadelphia when this monitored phone call was made.

      **III.**    **ADDITIONAL FACTS – YAHOO, HOTMAIL AND GMAIL ACCOUNT SEARCH WARRANTS (Ex. # 1-4, 8 & Doc. #53, 54, 68)**

To place these Internet warrants in perspective, a chronology is helpful.  The original Hotmail account search warrant was signed on March 30, 2007.  The Hotmail search was updated via another warrant signed August 29, 2007, by a different U.S. Magistrate Judge.  Then, as a result of those searches, other search warrants were signed with supplemental affidavits regarding the Hotmail , Yahoo and Gmail accounts.  These last warrants, were all approved by a third U.S. Magistrate Judge on October 17, 2007.

In addition to the common facts listed in Section II, the Yahoo, Hotmail and Gmail search warrants include more detailed information about the scheme.  For example, once the CW arrived in China, photos were taken of the pair to substantiate the marriage that would follow.  Wu instructed CW to keep in contact with the Chinese national upon CW's return to the United States.  Then, one year later, the CW was instructed to return to China to participate in immigration interviews for the Chinese national.  Wu promised to pay the CW $25,000 if the Chinese national actually received Permanent Resident status.  The CW also revealed the names of others involved and the fact that the CW would receive extra payment for recruiting people into the scheme.

According to all of the Internet affidavits, Wu used e-mail to communicate with the CW.  In particular, the CW produced a copy of a February, 2007 e-mail from the Hotmail account instructing the CW to produce documents to Wu, including phone bills, letters from CW to the Chinese national and tax records.  The Hotmail and Gmail

affidavits go on to state that the Hotmail account is linked to a name that both the CW and CRI know to be an alias of Wu.

Once the Hotmail account was accessed through the first search warrant, other accounts and e-mails were discovered, including the Gmail account. The Gmail affidavit adds that the Gmail account was used by or on behalf of Wu to arrange for a party for participants in the scheme.

When investigators applied for the August 29, 2007, Hotmail warrant, the application was supplemented by Custom officials' observations that on August 16, 2007, Wu was carrying a laptop and blackberry device on his return from China. Investigators also mentioned that they found travel itineraries in the Hotmail account, which were consistent with the CW's China itinerary. Additionally, more addresses and accounts were discovered and linked to persons participating in the scheme.

Finally, the October Hotmail and Yahoo affidavits added that the CRI made a monitored phone call to Wu in September of 2007. Wu asked the CRI if he/she had sent an e-mail to Wu on his Hotmail account. He instructed the CRI to send E-mails on either his Hotmail account or others. During this call, the CRI and Wu talked about recruiting new people into the scheme. Wu indicated he would e-mail the necessary paperwork to the CRI for the recruits. According to the Yahoo affidavit, Wu said his new primary e-mail was the Yahoo account.

### IV.   ADDITIONAL FACTS – WATTS STREET RESIDENCE (Ex.# 5 & Doc. #55)

According to the additional facts in this affidavit, Wu reentered the United States on March 12, 2007 from China. He listed three United States addresses: one on Watts Street, one on Broad Street and one on Girard Avenue, all in Philadelphia.

The affidavit then goes on to describe the September 2007 monitored phone call that the CRI placed to Wu, as discussed in Section III. As indicated above, Wu and the CRI discussed bringing new recruits into the scheme and that Wu would e-mail to CRI the necessary paperwork for the new recruits. Then, Wu instructed the CRI to send the completed paperwork by regular mail to the Girard Avenue address.

Also in September of 2007, the CW met with Wu. Wu told the CW that he would send paperwork for the fraudulent marriage to the CW. Per Wu, the completed paperwork was to be returned to Wu at the Girard Avenue address.

However, further investigation via the U.S. Postal Service determined that mail directed to the Girard Avenue address is actually delivered to the Watts Street address. The postal worker who delivers mail to Wu identified the proper address by photos of the building, photos of Wu and his own personal observation and experience. The postal worker indicated that Wu lived at the Watts Street address, parked a car there and received his mail through the postal worker at the Watts Street address, regardless of the Girard Avenue designation.

Finally, there are several paragraphs in the affidavit describing Wu's use of computers and electronic equipment to perpetrate the fraud. For example, the CRI and CW both indicated that Wu used a Blackberry-type device, laptop and other electronic devices when e-mailing them or to facilitate keeping documentation of the scheme. Specifically, when Wu returned to the country from an April 2007[2] trip to China, Custom

---

[2] The 8/29/08 Hotmail warrant (Ex. # 3), lists August 16, 2007, as the date Wu was observed carrying a laptop and Blackberry-type device upon his reentry from China. The Watts Street (Ex. #5) and Broad Street warrants (Ex. #9, Attachment to Government's Response), list April 16, 2007, as the date with similar facts. It is uncertain whether these are separate trips, for which similar observations were made, or a simple typo between August and April. In either situation, the fact listed would occur prior to the issuance date for the warrant.

7

officials observed him carrying a laptop and Blackberry-type device. Moreover, during one monitored call by CRI to Wu, they discussed the scheme and Wu indicated that when he receives paperwork he scans the documents into his computer and destroys the originals. Moreover, the facts about his e-mail activity using the Hotmail and Yahoo accounts found in Section III were repeated in this affidavit, with the added information that the searches for those accounts netted information confirming Wu's use of e-mails to facilitate the scheme.

> V. **ADDITIONAL FACTS – LATITUDE AND LONGITUDE (Ex. #7 & Doc. #65)**

Turning to the affidavit for the latitude and longitude order, in addition to the common facts listed in Section II, there is more information about the September 7, 2007, monitored phone call made by the CRI to Wu. The specific phone number is listed, as well as the phone number from which a return phone call was made. During a second call to Wu, the CRI and Wu discussed recruiting additional people into the scheme. The remaining details of the phone call are similar to those listed in the affidavit for the Watts Street address discussed above.

Then, there is a description of the CRI placing another monitored phone call to Wu a few days later. This time, Wu told the CRI that he would be in Minneapolis on September 15, 2007, and wanted to meet the CRI for dinner, because he did not want to discuss money over the phone. On that same day, the CW contacted Wu at the phone number previously called by the CRI. Wu gave the CW a new number at which to reach him. This new number matched the number from which the return call was made to the CRI. Wu similarly told the CW that he would be in Minneapolis on the 15th and that he

didn't want to talk about money over the phone. Both the CRI and CW confirmed that Wu uses multiple cell phones and travels in and out of Minnesota to perpetrate the fraud.

### VI.   ADDITIONAL FACTS – BROAD STREET ADDRESS (Ex. #9 & Doc. # 70)

In addition to the facts listed in Section II above, this affidavit includes the description of Wu's re-entry into the United States after a March, 2007 trip to China that was discussed in Section IV and found in the Watts Street warrant. To repeat, Wu told Custom officials that he lived at three addresses, including the Broad Street address in Philadelphia. This warrant adds new facts to the mix. For example, Wu's driver's license listed the Broad Street address, his new car was registered at that address and Wu received mail at Broad Street. Moreover, it was determined by a records check that Wu's parents own the property on Broad Street and that a person matching Wu's description was seen in October 2007 at that address. Finally, the same information related to Wu's use of computers that was included in the Watts Street warrant, are included here in paragraph 17(a)-(c).[3]

### VII.   FACTS FOR SEARCH OF WU'S PERSONAL PROPERTY (Ex. #6 & Doc. # 91)

This is the last search warrant signed and executed. This warrant permitted ICE agents to search personal property of Wu after his arrest. Wu was arrested on October 30, 2007, at the airport, after he was indicted in this case. The indictment is mentioned in the affidavit, establishing probable cause that a crime was committed. The indictment

---

[3] Exhibit #9 and the affidavit attached to Defendant's motion ends at page 5 and paragraph #13. However, in it's original response to the motion, the USA indicated that the complete affidavit is 13 pages long and 25 paragraphs. The USA submitted the true and accurate affidavit as an attachment to their responsive memo. The exhibit book was requested by the court at the hearing and was not originally relied upon by the parties. This court relies on the entire record, including the government's responsive memo and the complete Broad Street affidavit where these paragraphs can be found.

9

contains several paragraphs of Overt Acts, which explain in more detail the common facts listed in Section II and Section III.

Wu was arrested at the Minneapolis/St.Paul airport when he arrived from Philadelphia. He was observed with both carry-on and checked luggage upon his arrest. The arresting officers also heard a phone ringing in one of the pieces of luggage. There were also two cell phones, as well as cash and money orders on Wu's person. Upon being interviewed, Wu said he had about $20,000, and a laptop computer in his luggage. He also carried with him a storage disk consistent with those used in digital cameras.

The affidavit then recites information found in the Internet, Watts Street and Broad Street affidavits regarding Wu's use of computers and other electronic equipment to communicate and give instructions to participants in the scheme. The affidavit also indicates that Wu has used phones to communicate with participants in the conspiracy, as indicated in the consensually monitored phone calls between the CRI and Wu. Finally, the affidavit contains a paragraph establishing why there is a fair probability that the luggage would contain incriminating evidence. This includes the agent's training and experience, Wu's pattern of traveling in and out of Minnesota to facilitate the plan, and his payment to participants in the amounts consistent with the amount with which he was traveling that day.

**VIII.   THE LAW**

The Fourth Amendment requires that, for a search warrant to be authorized, a detached and neutral magistrate must find that it is supported by probable cause. *Johnson v. United States*, 333 U.S. 10, 14 (1948); *Warden v. Hayden*, 387 U.S. 294, 301-02 (1967). A search warrant is supported by probable cause when a reasonable person,

considering the all facts and circumstances alleged in the supporting affidavit, would find a fair probability that incriminating evidence is on the premises to be searched. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002). There must be a "nexus…between the item to be seized and criminal behavior." *Hayden*, 387 U.S. at 307. There must also be a nexus between the item to be seized and the location to be searched, which may be reasonably inferred given all the circumstances. *United States v. Tellez,* 217 F.3d 547 (8th Cir. 2000). When reviewing the sufficiency of the affidavit, a court may only consider the information stated in the affidavit. *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003).

Given the wide variety of circumstances that can lead to a finding of probable cause for a search warrant, great deference is accorded to a reviewing judge's determination. *United States v. Leon,* 468 U.S. 897 (1984); *United States v. Grant*, 490 F.3d 627, 631-32 (8th Cir. 2007), *quoting Gates*, 462 U.S. at 236. The reviewing court is to simply ensure that the issuing judge had a "substantial basis" for finding probable cause. *Id.,* 462 U.S. at 239. Courts should not review search warrants in a hyper-technical fashion. *United States v. Caswell,* 436 F.3d 894 (8th Cir. 2006).

When information from a confidential informant is disclosed in the supporting affidavit, a related question is whether the information from the informant is reliable. If the affidavit does not indicate whether an informant previously supplied trustworthy information, reliability may be demonstrated when an officer independently corroborates information received from the informant. *United States v. Warford*, 439 F.3d 836, 841 (8th Cir. 2006); *United States v. Carpenter*, 422 F.3d 738, 744 (8th Cir. 2005). The reliability, veracity and basis of knowledge of the informant are not independent

11

elements, but, instead, must be viewed in light of the totality of the circumstances set forth in the affidavit. *United States v. Olson*, 21 F.3rd 847, 850, (8th Cir. 1995), *quoting Gates,* 462 U.S. at 233.

In determining whether the informants' tips have been corroborated, even innocent activity can provide sufficient support. *United States v. Little*, 735 F.2d 1049, 1055 (8th Cir. 1984); *United States v. Morales*, 923 F.2d 621 (8th Cir. 1991). And not every detail must be corroborated. *United States v. Gladney,* 48 F.3rd 309 (8th Cir. 1995). Moreover, if separate witnesses provide consistent information this can establish reliability to support a finding of probable cause. *United States v Fulgham*, 143 F.3d 399 (8th Cir. 1998). Finally, if the information that is corroborated is consistent with the information the informant gives from his/her own personal knowledge, such information is regarded as reliable, particularly when the information is against the witness's penal interests. *United States v. Landis*, 632 F.2d 66 (8th Cir. 1980); *United States v. Tyler,* 238 F.3d 1036 (8th Cir. 2001).

### IX. DISCUSSION

In this case, the initial challenge relates to the information gleaned from the CRI and CW, and how that information was presented as "corroborated" in the affidavit. The defendant, overall, argues that the affidavits do nothing but state conclusions that the information was corroborated. The government argues that the affidavits clearly indicate that the information was corroborated through various investigative methods.

It is probably most accurate to say that the affidavits detail *how* the information was corroborated, but did not provide as many details on *what* information was corroborated. But this is not a case where the agent simply said that the information was

"verified", with no explanation. Instead, each affidavit goes on to explain that the information provided was verified through telephone and airline records, as well as immigration files. And the affidavits do not stop there. They describe not only *that* consensually monitored phone calls and meetings occurred between the CRI or CW and Wu, but also *what* was discussed. When the CW and CRI indicate, for example, that they were recruited by Wu to participate in the scheme, monitored phone calls included discussions about recruitment. When the CW and CRI describe the payments and free trips to China that they were offered to participate in the scheme, phone calls and meetings with Wu confirmed these types of plans. Moreover, when the CW stated that Philadelphia was a hub city for the scheme, surveillance showed Wu in that city during one of the monitored phone calls discussing recruitment.

But that's not all. The information given by each person was mutually consistent. This consistency stretches from the purpose of the scheme, to being recruited by Wu, to the planned and experienced trips to China and more. This information was not based upon conjecture or rumor. It was based upon their personal experience, which, when admitted, was against their respective penal interests. Accordingly, even on the most basic level the affidavits establish the reliability of the information relayed by the CW and CRI.

More importantly, each search warrant contains more facts than just these few paragraphs setting forth the information gleaned in the initial phases from the CRI and CW. Not one warrant relies solely on the foundational facts listed in Section II. Rather, a four-corners review of each search warrant starts with the picture developed by the CRI

13

and CW, but each completes the picture with further details outlining the nexus between the item to be seize, criminal behavior and the location of the item.

        a. <u>Internet Warrants</u>

The earliest warrant in this case, the March 30, 2007 warrant for the Hotmail account, reveals that Wu specifically offered to pay the CW $25,000 if the Chinese national the CW was scheduled to marry actually obtained Permanent Resident Status. The CW admitted the specific amounts he/she either received or would receive if the CW followed through with the plan. These admissions are against CW's penal interest and are consistent with the more generalized reports of how the scheme worked according to the CRI. The CW also detailed what happened in his/her trip to China. This information was consistent with the CRI's information that Wu offered to send her to China, free of charge, to participate in the scheme.

Then, e-mails described in the affidavit continue to paint the picture of criminal activity and the nexus to the accounts to be searched. The CW did not just tell investigators about e-mails in which Wu gives instructions regarding the scheme, the CW provided a copy of such an e-mail. Finally, the screen name associated with the account matched an alias for Wu known both to the CRI and CW. All these facts combine to provide sufficient facts for this court to find a fair probability that contraband or evidence of a crime would be found in the Hotmail account.

Once the Hotmail account is accessed, the other Internet affidavits have even more information that confirms the information from the CRI and CW. There are other accounts with communications about the scheme and he used the accounts to

communicate with the CW and CRI. These facts establish a clear nexus between the accounts and the criminal activity.

### b. Watts Street and Broad Street Warrants

So too, the warrants for the residences in Philadelphia (Watts and Broad Streets) contain ample facts to establish probable cause for the searches. These warrants contain corroborating facts gleaned from a monitored phone call placed to Wu by the CRI, as well as a meeting between the CW and Wu. In each, the desire of Wu to recruit others into the scheme is substantiated. The accounts given by the CW and CRI converge once again when Wu gave them each identical addresses to send completed paperwork for the scheme.

Moreover, Wu is connected to each address and the items to be seized were connected to each address as well. For example, Wu's parents are connected to the Broad Street address. Also, a car owned by Wu is registered to that address and a person matching his description was observed at that address. Wu admitted that he used the Broad Street address when he was interviewed after returning once from China. Obviously, given the CRI and CW's information about the scheme, the fact that Wu was returning from China was significant. He also admitted using the Girard and Watts addresses during that same interview and those addresses were tied to monitored conversations between Wu, the CW and the CRI.

The Watts Street connection is more complicated, but only because Wu apparently gave a false address regarding where he accepted mail. The Watts Street connection to Wu came directly from a knowledgeable postal service, whose reason to fabricate or exaggerate is minimal. The postal worker had personal experience delivering

Wu's mail to Wu at the Watts Street address. This was confirmed through photos shown to the postal worker. Also, a car connected to Wu was parked at the Watts Street address. Moreover, the Watts Street address is tied to items to be seized based upon Wu's attempt to have the CW and CRI send fraudulent paperwork to the Watts Street address through Girard Avenue.

Finally, the information provided regarding Wu's computer use for each warrant was detailed and substantiated by telephone calls and meetings with the CW and CRI. Officials observed Wu with computers on trips from China and they saw actual E-mails sent by Wu to the CW. Thus, there is plenty of evidence that supports probable cause for these warrants.

### c. Latitude and Longitude

Turning next to the application for the latitude/longitude order, this probable cause is based largely upon information gathered by the agents after consensually monitored calls by the CRI and CW. During the calls, Wu discussed the scheme and made identical statements to the CW and CRI. The phone numbers were interconnected and it was clear they were used for the purpose of communicating about the scheme. There is more than ample evidence in this affidavit for the request given the information gathered within control of the agents, in combination with the common facts listed earlier. They are mutually-confirming facts and it all points toward probable cause.

### d. Personal Property Warrant

Lastly, the court turns to a four-corners review of the personal property warrant. The defendant asks the court to find no probable cause for the indictment and, thus, no probable cause for the warrant. This is not the proper sequence of review. The grand

jury has already decided probable cause in returning the indictment. So once the grand jury indicted Wu, we need only ask whether the items to be seized have a nexus to the criminal behavior indicted and whether it could be found in the location desired to be searched.

This warrant establishes that Wu used e-mails and cell phones to communicate with and instruct the participants in the scheme. Thus, if he used E-mails and phones to communicate with participants about the scheme, there is certainly a nexus between evidence to be found in cell phones or laptops and other electronic devices he was carrying. Similarly, the digital camera disk is linked to the photos taken of Chinese nationals with their soon-to-be "spouses", as described in the indictment.

Next, the luggage is clearly a reasonable location to search for contraband of the fraud. Wu's admitted he possessed large amounts of cash, which is consistent with his payment to scheme participants. Furthermore, Wu assisted participants in obtaining passports and other documents when meeting participants in Philadelphia, the city from which Wu was returning when arrested. Thus, it is reasonable to assume evidence of such documents or other contraband of the scheme would be found in his luggage. Clearly then, this warrant also contains sufficient facts to warrant a probable cause finding.

## X.     **CONCLUSION**

Each warrant challenged in this case presents sufficient facts to establish probable cause for the searches conducted. In reading these warrants in their entirety and without hyper-technical rigidity, then each warrant paints a picture of sufficient reliability and corroboration to uphold the warrants.

## XI.    RECOMMENDATION

Based upon the foreground and all the files and proceedings herein, IT IS HEREBY RECOMMENDED THAT:

1. Defendant's Motion to Suppress Evidence Seized From Yahoo Account (Doc.#53) be DENIED:

2. Defendant's Motion to Suppress Evidence Seized from Hotmail Account (Doc. #54) be DENIED.

3. Defendant's Motion to Suppress Evidence Seized from Watts Street Address (Doc.#55) be DENIED.

4. Defendant's Motion to Suppress Evidence Seized from Latitude/Longitude Order (Doc. #65) be DENIED.

5. Defendant's Motion to Suppress Evidence Seized from Gmail Account (Doc. #68) be DENIED.

6. Defendant's Motion to Suppress Evidence from Broad Street Address (Doc. #70) be DENIED.

**7.** Defendant's Motion to Suppress Evidence from Personal Property of Wu (Doc.#91) be DENIED.


Dated this 9th day of January, 2008         s/ *Jeanne J. Graham*
                                             JEANNE J. GRAHAM
                                             United States Magistrate Judge


**NOTICE**

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **January 24, 2008**. A party may respond to the objections within ten days after service thereof. Any objections or responses filed under this rule shall not exceed 3,500 words. The district court judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit. Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.